**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

BEN-ZION WOLHENDLER, individually and on behalf of all others similarly situated,

*Plaintiff*,

v.

NATIONAL MILK PRODUCERS FEDERATION; AGRI-MARK, INC.; BONGARDS CREAMERIES; COOPERATIVE MILK PRODUCERS ASSOCIATION; DAIRY FARMERS OF AMERICA, INC.; LANCO DAIRY FARMS COOP, INC.; LONESTAR MILK PRODUCERS; MARYLAND & VIRGINIA MILK PRODUCERS COOPERATIVE D/B/A MAOLA LOCAL DAIRIES; MICHIGAN MILK PRODUCERS ASSOCIATION; MOUNT JOY FARMERS CO-OPERATIVE ASSOCIATION; NORTHWEST DAIRY ASSOCIATION D/B/A DARIGOLD; PRAIRIE FARMS DAIRY, INC.; TILLAMOOK COUNTY CREAMERY ASSOCIATION; UNITED DAIRYMEN OF ARIZONA; and DOES 1-100,

*Defendants*.

Civil Action No. 2:26-cv-1197

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

**Page**


I. PRELIMINARY STATEMENT .......... 1

II. JURISDICTIONAL ALLEGATIONS .......... 5

III. THE PARTIES .......... 6

A. Plaintiff .......... 6

B. The Defendants .......... 7

1. Defendant National Milk Producers Federation .......... 7

2. Defendant Agri-Mark, Inc. .......... 8

3. Defendant Bongards Creameries .......... 8

4. Defendant Cooperative Milk Producers Association .......... 8

5. Defendant Dairy Farmers of America, Inc. .......... 9

6. Defendant Lanco Dairy Farms Coop, Inc. .......... 9

7. Defendant Lonestar Milk Producers .......... 10

8. Defendant Maryland & Virginia Milk Producers Cooperative d/b/a Maola Local Dairies .......... 10

9. Defendant Michigan Milk Producers Association .......... 10

10. Defendant Mount Joy Farmers Co-operative Association .......... 11

11. Defendant Northwest Dairy Association d/b/a Darigold .......... 11

12. Defendant Prairie Farms Dairy, Inc. .......... 12

13. Defendant Tillamook County Creamery Association .......... 12

14. Defendant United Dairymen of Arizona .......... 12

15. Defendants Does 1-100 .......... 13

IV. DEFENDANTS' EXPORT CARTEL .......... 13

A. NMPF Creates CWT to Manage the Supply of Milk .......... 13

B. Competitors Paying Competitors: How CWT's Export Subsidy Works ... 16

C. Defendants Repeatedly Recommitted to Export Assistance ... 17

1. Export Assistance Pulled Milk Out of the Domestic Market ... 26

D. Less Domestic Supply Means Higher Milk Prices ... 30

E. The Structure of the Dairy Industry Makes Collusion Feasible ... 31

1. A Small Number of Cooperatives Dominate Production ... 31

2. New Competitors Cannot Easily Enter ... 32

3. Dairy Products Are Interchangeable Commodities ... 33

4. Consumers Keep Buying Dairy When Prices Rise ... 34

5. Defendants Have Had Repeated Opportunities to Coordinate ... 36

F. Each Export-Assisted Product Is a Distinct Market ... 38

G. Raw Milk Is the Common Upstream Input ... 39

H. The Geographic Market Is National ... 40

I. Harm to Competition and to Consumers ... 42

1. Export Subsidies Are Anticompetitive, and CWT's Version Is Worse ... 42

2. The Export Assistance Program Raised Domestic Milk Prices ... 44

3. Retail Prices Followed Farm Prices ... 44

4. Consumers and Retailers Could Not Avoid the Overcharge ... 46

J. The Capper-Volstead Act Does Not Protect This Conduct ... 47

V. CLASS ACTION ALLEGATIONS ... 49

COUNT I: CONSPIRACY IN RESTRAINT OF TRADE (Sherman Act § 1, 15 U.S.C. § 1; Clayton Act § 16, 15 U.S.C. § 26 — Injunctive Relief Only) ... 52

COUNT II: VIOLATIONS OF STATE ANTITRUST LAWS (Indirect Purchaser States) ... 54

COUNT III: UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE CONSUMER PROTECTION LAWS ........ 55

COUNT IV: UNJUST ENRICHMENT UNDER STATE LAW ........ 57

RELIEF REQUESTED ........ 57

DEMAND FOR JURY TRIAL ........ 58

Plaintiff Ben-Zion Wolhendler ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), through his undersigned counsel, files this class action complaint (the "Action") against Defendants National Milk Producers Federation ("NMPF"); Agri-Mark, Inc.; Bongards Creameries; Cooperative Milk Producers Association; Dairy Farmers of America, Inc.; Lanco Dairy Farms Coop, Inc.; Lonestar Milk Producers; Maryland & Virginia Milk Producers Cooperative d/b/a Maola Local Dairies; Michigan Milk Producers Association; Mount Joy Farmers Co-operative Association; Northwest Dairy Association d/b/a Darigold; Prairie Farms Dairy, Inc.; Tillamook County Creamery Association; United Dairymen of Arizona; and Does 1-100 (collectively, "Defendants"). Plaintiff's allegations about himself and his own acts and experiences are based on personal knowledge, and all other allegations are made on information and belief, including the investigation of counsel. Plaintiff alleges as follows:

## I. PRELIMINARY STATEMENT

1. Defendant National Milk Producers Federation ("NMPF") is a farm-commodity policy organization that represents most of the dairy-marketing cooperatives in the United States.[1] For decades, NMPF designed and operated a national, farmer-funded program known as "Cooperatives Working Together" ("CWT"), which still operates today under a new name, the NEXT Program (NMPF Export Program).[2] CWT is a cartel of dairy cooperatives and dairy producers.

2. The name CWT is a pun: "cwt" is the abbreviation for hundredweight, the unit of measure farmers use when they sell milk destined for dairy products. In antitrust terms, the name

---

[1] *See* NMPF, *Cooperative Members*, https://www.nmpf.org/about/members/member-cooperatives/.

[2] CWT now operates as the "NEXT Program," but for clarity this Complaint continues to refer to the conspiracy as CWT. The new name Defendants have given the conspiracy does not change any of the substantive allegations about it.

"Cooperatives Working Together" is a pun as well, because Defendants' coordinated conduct is a "contract, combination, or conspiracy" that restrains interstate commerce and forces end consumers and indirect purchasers, such as Plaintiff and members of the putative Class, to pay higher retail prices for dairy products.

3. More specifically, under CWT's export assistance program, CWT members agree to use their voluntary contributions to subsidize one another's dairy exports to foreign markets. The arrangement works much like a government-funded export subsidy, with one key difference: here, the subsidy is paid for by horizontal competitors who agree to pay each other to export more. That difference makes the program even more anticompetitive on net, because, unlike a government-funded subsidy, it brings no new capital to CWT members that could be used to expand production. The horizontal payments lead CWT members to divert dairy supply away from domestic U.S. markets for products such as cheese and butter, without giving CWT as a whole any incentive to produce more. The result is a direct reduction in the domestic supply of those products, along with the diversion of milk, the input used to make them, into foreign markets. This supply restriction accomplishes the stated purpose of Export Assistance: domestic prices rise above competitive levels for every U.S. dairy product that is either directly subject to CWT's Export Assistance or uses milk as an important input. The harms of export subsidies are well enough understood that World Trade Organization members have agreed to eliminate government export subsidies on agricultural products. Those rules bind governments, not private parties; CWT achieves a similar result through a collusive rim of horizontal payments among its members. No individual CWT member acting in its own unilateral self-interest would spend its own profits subsidizing a horizontal competitor's exports. Doing so becomes collectively rational only when

the colluding firms share an expectation of reciprocity and Export Assistance produces a collective increase in domestic prices that offsets the cost of their voluntary contributions.

4. Through this mechanism, the CWT cartel works to artificially fix, maintain, suppress, or raise prices in U.S. markets for dairy products, including, among others, milk, cheese, and butter. CWT does so through the "Export Assistance Program," under which dairy cooperatives and producers accounting for as much as 70% of U.S. milk marketings collude to impose supply restraints—specifically, exporting massive quantities of dairy products to suppress domestic supply in an effort to drive up domestic prices for all dairy products.[3] Because of Defendants' unlawful conduct, Plaintiff and other indirect purchasers—everyday Americans who consume dairy products—who bought cheese and other dairy products at retail have paid, and continue to pay, supracompetitive prices from January 1, 2018, to the present (the "Class Period").

5. CWT has been the subject of high-profile antitrust litigation before. Over the past decade, it has paid nearly $272 million to settle antitrust claims brought by various groups of plaintiffs.[4] CWT has nonetheless continued to violate the antitrust laws, albeit through different conduct than was alleged in those earlier cases. As NMPF's chief executive officer, Jim Mulhern, put it in 2018, CWT "is a way for dairy farmers to help one another by giving support that boosts milk prices for everyone. And with the entire sector struggling with trade and economic challenges, this self-help effort is more important than ever." He added: "So far this year [in 2018], CWT has helped member cooperatives capture contracts to sell nearly 1.3 billion pounds of milk equivalent.

[3] *See* CWT press release, *CWT Participation Surpasses 70%* (Nov. 30, 2011), https://web.archive.org/web/20220815162738/http://www.cwt.coop/cwt-participation-surpasses-70/.

[4] *First Impressions Salon v. NMPF*, Civil Action No. 3:13-cv-00454 (S.D. Ill.) which settled in 2020 for $220 million (class period: 2008 to 2013); *Edwards v. NMPF*, Civil Action No. 11-cv-04766-JSW (N.D. Cal.), which settled in 2016 for $52 million (class period: 2003 to 2016).

It all adds up to an improved balance of supply and demand — enough to improve the milk prices received by all U.S. dairy farmers by as much as $0.50/cwt., according to both external and internal estimates."[5]

6. Dairy moves through a distribution chain that runs from dairy farmers and cooperatives, to processors and handlers, to distributors and retailers, and ultimately to consumers. Defendants' coordinated export and supply-restriction conduct artificially inflated prices at every level of that chain, and those overcharges were passed on to the end consumers who bought dairy products at retail.

7. The harm falls on ordinary households. Dairy is one of the most important sources of protein and other nutrients in the typical American diet.[6] Plaintiff and Class members are end consumers and indirect purchasers who bought dairy products at retail, and Defendants have

---

[5] Edairy News, *Cooperatives Work Together Helping Dairy Producer Bottom Line* (Dec. 6, 2018), http://web.archive.org/web/20201217063258/https://edairynews.com/en/cooperatives-work-together-helping-dairy-producer-bottom-line-62485/.

[6] In the dairy industry, dairy farmers, also referred to as "producers," sell raw milk to "handlers." Handlers, in turn, prepare the milk product for resale to consumers or serve as intermediaries to those who do. Consumer dairy products, such as fluid milk beverages, ice cream and cheese, can all be produced from "Grade A" or "fluid grade" raw milk. In the consumer market, however, milk beverages generally command a higher price than non-fluid products, which are known also as "manufactured dairy products." Consequently, the market into which dairy farmers sell their product values more highly (and pays a premium price for) Grade A milk ultimately used to produce beverage milk. This market premium based on end use creates an incentive among producers to divert their Grade A product to fluid milk handlers. Were this incentive not controlled, lower market prices would result from the increased supply, thereby harming milk production revenues.

The dairy industry also is characterized by daily and seasonal fluctuations in supply and demand. Consumer demand fluctuates significantly on a daily basis, primarily due to consumer buying patterns. On the other hand, milk production, while relatively constant on a daily basis, does vary seasonally: in fall and winter months, less milk is produced; in spring and summer months, more milk is produced. *White Eagle Co-op. Ass'n v. Conner*, 553 F.3d 467, 470 (7th Cir. 2009).

exploited the essential nature of those products by pushing up the prices consumers pay for dairy in the United States so they can earn supracompetitive returns.

8. Plaintiff therefore brings this lawsuit, individually and on behalf of all others similarly situated, seeking injunctive relief under the federal antitrust laws, and seeking actual and treble damages, reasonable costs and attorneys' fees, and pre- and post-judgment interest under the antitrust and consumer protection statutes of states that permit indirect purchaser recovery (commonly known as *Illinois Brick*-repealer statutes), including but not limited to the laws of the states identified in Counts II and III.

## II. JURISDICTIONAL ALLEGATIONS

9. ***Subject Matter Jurisdiction.*** This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, 1332(d), and 1367, and Section 16 of the Clayton Act, 15 U.S.C. § 26. Plaintiff's claims for injunctive and equitable relief under Section 1 of the Sherman Act and Section 16 of the Clayton Act present federal questions. The Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367. The Class Action Fairness Act, 28 U.S.C. § 1332(d), provides an independent basis for jurisdiction because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, the proposed Class has more than 100 members, and minimal diversity exists.

10. Defendants' conduct, and that of their co-conspirators, was within the flow of, was intended to have, and did have direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States.

11. ***Personal Jurisdiction.*** The Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of dairy products throughout the United States, including in this District; (c) had substantial contacts with

the United States, including this District; and/or (d) participated in an antitrust conspiracy that was directed at, and had the direct, foreseeable, and intended effect of, injuring the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

12. ***Venue.*** Venue lies in this District under Sections 12 and 16 of the Clayton Act, 15 U.S.C. §§ 22 & 26, and 28 U.S.C. § 1391(b), (c), and (d). One or more Defendants reside, are found, transact business, or have agents in this District; Defendants sold substantial quantities of dairy products here; Class members who reside in this District bought dairy products here at artificially inflated prices; and a substantial part of the events and conduct giving rise to Plaintiff's claims took place in this District.

13. No other forum would be more convenient for the parties and the witnesses.

## III. THE PARTIES

### A. Plaintiff

14. Plaintiff Ben-Zion Wolhendler is a citizen of New York.

15. During the Class Period, Plaintiff purchased dairy products at retail in New York for personal and household use. Plaintiff paid artificially inflated prices for those products as a result of Defendants' CWT/NEXT Program conspiracy.

16. Plaintiff was injured by paying these artificially high or supracompetitive prices for dairy products—prices that would have more closely reflected a competitive market but for the CWT/NEXT Program conspiracy. Plaintiff continues to purchase dairy products at retail in New York and intends to continue doing so.

## B. The Defendants

### 1. Defendant National Milk Producers Federation

17. Defendant National Milk Producers Federation is a trade association organized and existing under the laws of the Commonwealth of Virginia. Its principal place of business is located at 2107 Wilson Boulevard, Suite 600, Arlington, Virginia 22201.

18. Cooperatives Working Together d/b/a NEXT is a voluntary, producer-funded national program that the National Milk Producers Federation developed to "strengthen and stabilize milk prices." CWT's membership includes farmers in almost every state, and its participants have accounted for as much as 70% of U.S. milk marketings. Although CWT is separately funded, it is organized within National Milk Producers Federation's operating structure; it operates as an entity inside the NMPF structure and is headquartered at NMPF's offices, 2107 Wilson Boulevard, Suite 600, Arlington, Virginia 22201. The program was recently renamed NEXT, but for ease of reference this Complaint refers to it throughout as CWT.

19. NMPF manages CWT, which was formed primarily to carry out output restraints, reduce supply to eliminate competition, and thereby strengthen and stabilize domestic dairy prices through the "Export Assistance" program. That program began in 2003 and became CWT's exclusive focus in 2010. NMPF originally ran CWT as a two-pronged program: (1) herd retirements, which restricted dairy supply by shrinking the nation's dairy cow population; and (2) the Export Assistance program, which is the basis of this Action. The herd retirements ended in 2010, when NMPF refocused CWT solely on the Export Assistance program; the herd retirements later became the subject of the prior CWT litigation discussed in this Complaint.

20. The CWT Committee is a component board within CWT that sets policy for, and oversees, CWT's programs and activities. Its members are the NMPF Board of Directors,

representatives of participating cooperatives that do not belong to NMPF, and representatives of CWT's independent producer members.

**2. Defendant Agri-Mark, Inc.**

21. Defendant Agri-Mark, Inc. ("Agri-Mark") is a dairy cooperative organized under the laws of the Commonwealth of Massachusetts and headquartered at 40 Shattuck Road, Suite 301, Andover, Massachusetts 01810.

22. Agri-Mark is a member of CWT and, as a member, agreed to pay, and did pay, per-hundredweight assessments on its milk marketings: $0.04 per hundredweight (cwt) under CWT during the Class Period, and $0.02 per hundredweight under NEXT. CWT used those assessments to finance its output restraints—reducing supply to eliminate competition and thereby strengthen and stabilize domestic dairy prices through the "Export Assistance" program.

**3. Defendant Bongards Creameries**

23. Defendant Bongards Creameries ("Bongards") is a dairy cooperative organized under the laws of the State of Minnesota and headquartered at 250 Lake Drive East, Chanhassen, Minnesota 55317.

24. Bongards is a member of CWT and, as a member, agreed to pay, and did pay, per-hundredweight assessments on its milk marketings: $0.04 per hundredweight (cwt) under CWT during the Class Period, and $0.02 per hundredweight under NEXT. CWT used those assessments to finance its output restraints—reducing supply to eliminate competition and thereby strengthen and stabilize domestic dairy prices through the "Export Assistance" program.

**4. Defendant Cooperative Milk Producers Association**

25. Defendant Cooperative Milk Producers Association ("CMPA") is a dairy cooperative organized under the laws of the Commonwealth of Virginia and headquartered at 438 Tenth Street, Blackstone, Virginia 23824.

26. CMPA is a member of CWT and, as a member, agreed to pay, and did pay, per-hundredweight assessments on its milk marketings: $0.04 per hundredweight (cwt) under CWT during the Class Period, and $0.02 per hundredweight under NEXT. CWT used those assessments to finance its output restraints—reducing supply to eliminate competition and thereby strengthen and stabilize domestic dairy prices through the "Export Assistance" program.

**5. Defendant Dairy Farmers of America, Inc.**

27. Defendant Dairy Farmers of America, Inc. ("DFA") is a dairy cooperative organized under the laws of the State of Kansas and headquartered at 1405 North 98th Street, Kansas City, Kansas 66111.

28. DFA is a member of CWT and, as a member, agreed to pay, and did pay, per-hundredweight assessments on its milk marketings: $0.04 per hundredweight (cwt) under CWT during the Class Period, and $0.02 per hundredweight under NEXT. CWT used those assessments to finance its output restraints—reducing supply to eliminate competition and thereby strengthen and stabilize domestic dairy prices through the "Export Assistance" program.

**6. Defendant Lanco Dairy Farms Coop, Inc.**

29. Defendant Lanco Dairy Farms Coop, Inc. ("Lanco") is a dairy cooperative organized under the laws of the State of Maryland and headquartered at 1258 Maryland Ave., Hagerstown, Maryland 21740.

30. Lanco is a member of CWT and, as a member, agreed to pay, and did pay, per-hundredweight assessments on its milk marketings: $0.04 per hundredweight (cwt) under CWT during the Class Period, and $0.02 per hundredweight under NEXT. CWT used those assessments to finance its output restraints—reducing supply to eliminate competition and thereby strengthen and stabilize domestic dairy prices through the "Export Assistance" program.

**7. Defendant Lonestar Milk Producers**

31. Defendant Lonestar Milk Producers ("Lonestar") is a dairy cooperative organized under the laws of the State of Texas and headquartered at 813 8th St #300, Wichita Falls, Texas 76301.

32. Lonestar is a member of CWT and, as a member, agreed to pay, and did pay, per-hundredweight assessments on its milk marketings: $0.04 per hundredweight (cwt) under CWT during the Class Period, and $0.02 per hundredweight under NEXT. CWT used those assessments to finance its output restraints—reducing supply to eliminate competition and thereby strengthen and stabilize domestic dairy prices through the "Export Assistance" program.

**8. Defendant Maryland & Virginia Milk Producers Cooperative d/b/a Maola Local Dairies**

33. Defendant Maryland & Virginia Milk Producers Cooperative d/b/a Maola Local Dairies ("Maryland & Virginia") is a dairy cooperative organized under the laws of the Commonwealth of Virginia and headquartered at 13861 Sunrise Valley Drive, Suite 220, Herndon, Virginia 20171.

34. Maryland & Virginia is a member of CWT and, as a member, agreed to pay, and did pay, per-hundredweight assessments on its milk marketings: $0.04 per hundredweight (cwt) under CWT during the Class Period, and $0.02 per hundredweight under NEXT. CWT used those assessments to finance its output restraints—reducing supply to eliminate competition and thereby strengthen and stabilize domestic dairy prices through the "Export Assistance" program.

**9. Defendant Michigan Milk Producers Association**

35. Defendant Michigan Milk Producers Association ("MMPA") is a dairy cooperative organized under the laws of the State of Michigan and headquartered at 41310 Bridge Street, Novi, Michigan 48376.

36. MMPA is a member of CWT and, as a member, agreed to pay, and did pay, per-hundredweight assessments on its milk marketings: $0.04 per hundredweight (cwt) under CWT during the Class Period, and $0.02 per hundredweight under NEXT. CWT used those assessments to finance its output restraints—reducing supply to eliminate competition and thereby strengthen and stabilize domestic dairy prices through the "Export Assistance" program.

**10. Defendant Mount Joy Farmers Co-operative Association**

37. Defendant Mount Joy Farmers Co-operative Association ("Mount Joy") is a dairy cooperative organized under the laws of the Commonwealth of Pennsylvania and headquartered at 1471 West Main Street, Mount Joy, Pennsylvania 17552.

38. Mount Joy is a member of CWT and, as a member, agreed to pay, and did pay, per-hundredweight assessments on its milk marketings: $0.04 per hundredweight (cwt) under CWT during the Class Period, and $0.02 per hundredweight under NEXT. CWT used those assessments to finance its output restraints—reducing supply to eliminate competition and thereby strengthen and stabilize domestic dairy prices through the "Export Assistance" program.

**11. Defendant Northwest Dairy Association d/b/a Darigold**

39. Defendant Northwest Dairy Association d/b/a Darigold ("Northwest Dairy") is a dairy cooperative organized under the laws of the State of Washington and headquartered at 5601 6th Avenue South, Suite 300, Seattle, Washington 98108.

40. Northwest Dairy is a member of CWT and, as a member, agreed to pay, and did pay, per-hundredweight assessments on its milk marketings: $0.04 per hundredweight (cwt) under CWT during the Class Period, and $0.02 per hundredweight under NEXT. CWT used those assessments to finance its output restraints—reducing supply to eliminate competition and thereby strengthen and stabilize domestic dairy prices through the "Export Assistance" program.

**12. Defendant Prairie Farms Dairy, Inc.**

41. Defendant Prairie Farms Dairy, Inc. ("Prairie Farms") is a dairy cooperative organized under the laws of the State of Illinois and headquartered at 3744 Staunton Rd., Edwardsville, Illinois 62025.

42. Prairie Farms is a member of CWT and, as a member, agreed to pay, and did pay, per-hundredweight assessments on its milk marketings: $0.04 per hundredweight (cwt) under CWT during the Class Period, and $0.02 per hundredweight under NEXT. CWT used those assessments to finance its output restraints—reducing supply to eliminate competition and thereby strengthen and stabilize domestic dairy prices through the "Export Assistance" program.

**13. Defendant Tillamook County Creamery Association**

43. Defendant Tillamook County Creamery Association ("Tillamook") is a dairy cooperative organized under the laws of the State of Oregon and headquartered at 4175 Highway 101 North, Tillamook, Oregon 97141.

44. Tillamook is a member of CWT and, as a member, agreed to pay, and did pay, per-hundredweight assessments on its milk marketings: $0.04 per hundredweight (cwt) under CWT during the Class Period, and $0.02 per hundredweight under NEXT. CWT used those assessments to finance its output restraints—reducing supply to eliminate competition and thereby strengthen and stabilize domestic dairy prices through the "Export Assistance" program.

**14. Defendant United Dairymen of Arizona**

45. Defendant United Dairymen of Arizona ("UDA") is a dairy cooperative organized under the laws of the State of Arizona and headquartered at 2008 South Hardy Drive, Tempe, Arizona 85285.

46. UDA is a member of CWT and, as a member, agreed to pay, and did pay, per-hundredweight assessments on its milk marketings: $0.04 per hundredweight (cwt) under CWT

during the Class Period, and $0.02 per hundredweight under NEXT. CWT used those assessments to finance its output restraints—reducing supply to eliminate competition and thereby strengthen and stabilize domestic dairy prices through the "Export Assistance" program.

**15. Defendants Does 1-100**

47. Defendants Does 1-100 are additional members of CWT whose identities will be learned in discovery and who will be added as defendants if necessary. When appropriate, Plaintiff will seek leave under Fed. R. Civ. P. 15 and 21 to add these defendants.

## IV. DEFENDANTS' EXPORT CARTEL

### A. NMPF Creates CWT to Manage the Supply of Milk

48. The National Milk Producers Federation ("NMPF") was founded in 1916 "to foster an economic and political climate in which dairy producers and the cooperatives they own can thrive and prosper."[7] Jim Mulhern served as NMPF's chief executive officer, and ran the CWT program, until his retirement at the end of 2023.[8] CWT is a program "designed exclusively by America's dairy farmers for the benefit of America's dairy farmers."[9] CWT's website describes the program as follows:

> It is a voluntary, producer-funded, marketing-focused, national program developed by the National Milk Producers Federation (NMPF), to assist family farmers. Launched in July 2003, CWT is, in effect, a federation of cooperatives and producers formed in accordance with the Capper-Volstead Act. CWT operates as an entity within the NMPF structure so that administrative costs and

---

[7] NMPF, *About Us*, https://www.nmpf.org/about/about-nmpf/about-us/.

[8] Edairy News, *Cooperatives Work Together Helping Dairy Producer Bottom Line* (Dec. 6, 2018), http://web.archive.org/web/20201217063258/https://edairynews.com/en/cooperatives-work-together-helping-dairy-producer-bottom-line-62485/; NMPF, *Jim Mulhern to Retire as NMPF CEO; Gregg Doud Named Successor* (June 8, 2023), https://www.nmpf.org/jim-mulhern-to-retire-as-nmpf-ceo-gregg-doud-named-successor/.

[9] CWT, *What Is CWT?*, https://web.archive.org/web/20220815161215/http://www.cwt.coop/about-us/faqs/.

> direct program (operational) costs can be kept to an absolute minimum.[10]

49. CWT recruits milk producers across the United States through its website (which includes CWT's bylaws and a list of member cooperatives) and through the members of its cartel. CWT's members include 24 dairy cooperatives[11] (along with individual producers nationwide), and its participants have accounted for as much as 70% of U.S. milk marketings.[12] CWT originally ran a two-pronged supply restraint program. The first prong was the Export Assistance Program, the subject of this Action. The second was the "Herd Retirement Program," discussed below.

50. From 2003 to 2010, CWT and its members conspired through the "Herd Retirement Program," under which participating dairy farmers agreed to slaughter every dairy cow in their herds, limiting raw farm milk production through this premature "herd retirement." The conspiracy eliminated competition, reduced the number of dairy farmers in the market, and produced both short- and long-term increases in the prices of raw farm milk, butter, and cheese. Those supply restraints were the subject of litigation that has since settled.

51. On October 26, 2010, CWT voted to concentrate exclusively on export assistance, ending its multiple rounds of cow "herd retirements."[13]

---

[10] *Id.*

[11] CWT, *Who Is Part of CWT?*, https://web.archive.org/web/20220126102120/https://www.cwt.coop/membership/.

[12] CWT, *CWT Participation Surpasses 70%* (Nov. 30, 2011), https://web.archive.org/web/20220815162738/http:/www.cwt.coop/cwt-participation-surpasses-70/.

[13] Progressive Dairy, *CWT committee votes to focus on exports after 2010* (Oct. 29, 2010), https://www.agproud.com/articles/29961-cwt-committee-votes-to-focus-on-exports-after-2010.

52. On June 8, 2011, CWT announced publicly that it would no longer fund "herd retirements" or "cow removals."[14] CWT issued the following statement at the time, which reflected Defendants' agreement to focus the cartel exclusively on exports:

> The members of Cooperatives Working Together (CWT) reiterated their support this week for a multi-year program to help boost U.S. dairy exports, and thus help improve the economics of dairy farmers, with the stipulation that the program must be supported by 70% of the nation's milk supply.
>
> At a meeting Tuesday in Alexandria, Virginia, the farmer-run committee overseeing CWT voted to renew the program for two years, starting in January 2012 and running through December 2013 – once a 70% level participation level can be reached. Current membership pledges amount to 68% of the milk supply.
>
> "Cooperatives Working Together remains an incredibly important self-help tool for the nation's dairy producers. The members of CWT want to keep it going into the future because it helps farmers access the fastest-growing markets for their milk, which are overseas," said Jerry Kozak, President and CEO of NMPF, which manages CWT. "We fully expect the producer and cooperative community see the value in supporting a program that benefits every dairy farmer and that we will achieve our goal."
>
> Since the start of 2011, the program has used funds carried over from the previous year to help export 39 million pounds of cheese, to 20 countries. The renewal effort will ensure that the program will have new revenue coming in from its members starting next year to further bolster the export activities funded by CWT.
>
> The CWT program no longer funds herd retirements or cow removals, and will focus exclusively on assisting member organizations with dairy exports. Kozak noted that the export market "has been incredibly helpful to farmers in finding new homes for their milk output, but the loss of export markets in 2008 and 2009 illustrated what can happen when we aren't able to compete internationally. That's why CWT is so critical – it gives us a

[14] Hoard's Dairyman, *Cooperatives Working Together Members Support Two Year Commitment at 70% of Production, Starting in 2012, to Assist Producers* (June 8, 2011), https://hoards.com/article-2609-cooperatives-working-together-members-support-two-year-commitment-at-70-of-production-starting-in-2012-to-assist-producers.html.

> privately-run and funded enterprise that makes U.S. dairy exports competitive in global markets."
>
> Kozak said that an export-focused CWT program is an important complement to the proposed economic restructuring of dairy policy embodied by the reforms proposed in NMPF's Foundation for the Future program (the details of which can be found at www.futurefordairy.com). With approximately 15% of the nation's milk production headed for exports markets in 2011, "CWT will work in tandem with policy changes we want Congress to adopt to ensure that America's dairy farmers continue to have the ability to access and benefit from growing world demand for U.S. dairy products."
>
> Kozak said that at the next meeting of the CWT operating committee, in mid-November, the membership participation level will be assessed to verify that the 70% participation level has been reached. The two cent membership dues will subsequently start being collected in January 2012.[15]

## B. Competitors Paying Competitors: How CWT's Export Subsidy Works

53. CWT "assists" exports by subsidizing them. Members obtain the subsidy by submitting requests, which CWT then reviews. The subsidy currently covers anhydrous milkfat, butter and butter blends, natural cheeses, pasteurized process cheese, whole milk powder, ESL/aseptic fluid milk, cream, skim milk powder, and milk protein concentrate.[16] The products eligible for CWT export assistance have varied over the years: cheese, butter, anhydrous milkfat, and whole milk powder have received assistance since at least 2011, and cream cheese became eligible in 2019.[17]

---

[15] *See* NMPF, *CWT Members Support Two-Year Commitment at 70% of Production, Starting in 2012, to Assist Dairy Producers* (June 10, 2011), https://www.nmpf.org/newsletter/news-for-dairy-co-ops-june-2011/.

[16] *See* NMPF, *About NMPF Exports & Trade (NEXT)*, https://www.nmpf.org/programs/next/.

[17] *See* NMPF, *2011 Activities & Accomplishments Report*, https://www.nmpf.org/wp-content/uploads/2018/12/2011-Activities-Accomplishments.pdf; NMPF, *2019 Activities & Accomplishments Report*, https://www.nmpf.org/wp-content/uploads/2020/03/2019-Annual-Report_FINAL.pdf.

54. Critically, CWT members fund the subsidy through per-hundredweight assessments that membership requires them to pay, which CWT describes as voluntary contributions.[18] In practice, horizontal competitors are effectively paying one another to shift supply from the domestic market to the export market, sustaining a level of exports that is not competitively efficient.

55. The export subsidy pushes domestic prices up in two ways. Directly, it shrinks the domestic supply of products that receive EAP subsidies. Indirectly, it diverts fluid milk into exports of processed dairy products, which reduces the fluid milk available for domestic consumption and thereby raises the domestic price of every product that requires fluid milk as an essential input.

56. Subsidizing a rival's exports is not in any member's unilateral self-interest. It is collectively rational only if the members are coordinating to raise domestic prices by more than they pay to subsidize one another's exports. Put differently, one dairy producer has reason to subsidize a horizontal competitor's foreign exports only when both share an expectation of reciprocity and an expectation that their horizontal payments will raise domestic prices enough to offset their contributions to CWT's Export Assistance Program (EAP).

**C. Defendants Repeatedly Recommitted to Export Assistance**

57. Much of what is publicly known about the Export Assistance Program comes from press releases in which the CWT Defendants described the cartel's export activities.

58. According to Defendants, once CWT decided to focus exclusively on exports, the Export Assistance Program became extremely profitable for them. In a fall 2012 update to its

---

[18] *See* NMPF, *About NMPF Exports & Trade (NEXT)*, https://www.nmpf.org/programs/next/; CWT, *Bylaws* art. XV, § 143(I), https://web.archive.org/web/20220521122837/http://www.cwt.coop:80/about-us/by-laws/.

members, CWT touted the benefits Defendants gained by concentrating their conspiracy on the mass export of milk:

> **Making a difference in <u>every</u> producer's milk check**
>
> By assisting member cooperatives in selling dairy products overseas, CWT is having a significant impact on every dairy farmer[']s milk check. Analysis of CWT activity by Dr. Scott Brown, University of Missouri, indicates that CWT-assisted shipments of American cheese and butter as of September 30, 2012, have added an average of 43 cents per hundredweight of milk to the payments received by dairy farmers from first handlers.
>
> **68% of American cheese exports**
>
> Through the end of October 2012, CWT has assisted 10 member cooperatives in selling 106.3 million pounds of Cheddar, Monterey Jack, and Gouda cheese and 61.4 million pounds of butter and AMF to 36 different destinations. By providing assistance on basic commodities, the dollars dairy farmers representing 70% of U.S. milk production are investing are having the most direct, positive impact on farm-level milk prices as Dr. Brown's analysis shows.
>
> The graph to the left shows the distribution of the cheese CWT has assisted members in selling through the October 2012. Asia accounts for 42.5% of the cheese sold with sales to Japan 65% of that total. The Middle East ranks second at 23.8% of CWT-assisted cheese sales and Saudi Arabia makes up 36% of those sales.
>
> 94% of the cheese CWT has helped members sell through October 2012 is scheduled to be shipped and delivered before the end of the year.
>
> **63% of butter exports**
>
> Since CWT added butter and anhydrous milk fat (AMF) to the active list of products CWT is assisting members in selling overseas, 165 sales to 25 countries totaling 61.3 million pounds have been made. Considering that there is a reported world surplus of butterfat, CWT support of these sales has been a key factor in achieving this level of sales activity.
>
> As the graph on the right shows, where CWT-assisted butter has been sold is very different from CWT-assisted cheese sales. The Middle East accounts for almost 73% of all butter sales while sales in Asia were 8.7% of the total. North Africa makes up 14.2% of all sales.

Of the 44.1 million pounds of butter sold in the Middle East, 28.8% has gone or will go to Saudi Arabia. Egypt's 13% share is equal to 5.7 million pounds of the butter sales to that region.

In North Africa, Morocco makes up 90% of the 8.5 million pounds of CWT-assisted sales to that region.

**CWT: A major factor in keeping supply in line with demand**

Through the end of July, the 60.7 million pounds of CWT-assisted cheese shipped made up 68.4% of U.S. American cheese exports and 16.9% of all U.S. cheese exports. During the same period, the 47.1 million pounds of CWT-assisted butter shipped made up 62.6% of U.S. butter exports. And, essentially all of that butter is at the world standard of 82% butterfat content.

Through September, U.S. milk production is running 3.6 billion pounds ahead of last year, a 2.5% increase in production. In an industry where a one percent increase can cause milk prices to fall, this year's level of growth could have resulted in even more dairy farmer economic stress.

Fortunately, CWT-assisted export sales of cheese, butter, AMF and whole milk powder through the end of October is the equivalent of 2.3 billion pounds of milk (on a milkfat basis) that has or will be going into foreign markets. So instead of an additional 3.6 billion pounds of milk coming onto the domestic market, thanks to CWT, that number is much more manageable.

Even after a new farm bill is passed and goes into effect, CWT will continue to play a critical role in helping to grow the stake that U.S. dairy farmers have made in the developing markets of Asia, the Middle East and North Africa.

**Every member should get a member**

Being an effective and consistent player in the world dairy market is critical to every dairy farmer and every dairy cooperative in the United States. Whether a cooperative exports products or not, the positive impact CWT has on sales of U.S. dairy products overseas has a positive impact on the domestic price for the products every cooperative sells.

In addition to cooperatives encouraging other cooperatives to join CWT, dairy farmers need to encourage other dairy farmers to pitch in. Chances are that if your neighbor is shipping his or her milk to a

> proprietary plan, they aren't in CWT. Please take the time to ask them to join in.[19]

59. In June 2013, Defendants chose to commit to the program for two more years. Their press release announcing that decision stated:

> The members of Cooperatives Working Together (CWT) today endorsed a larger investment in the farmer-funded self-help program, voting to enhance the membership requirement from 2¢ per hundredweight to 4¢ per hundredweight, effective July 1, 2013, and running through December 31, 2015.
>
> The additional investment will cover the large increase in CWT member requests for export assistance in 2013, driven by increased demand in world dairy markets for U.S. American-type cheeses, butter, whole milk powder, and anhydrous milkfat.
>
> "Because of increased activity in 2013, the members decided to enhance CWT's revenue base in order to continue to successfully compete in world markets this year, and into the future," said Jerry Kozak, President and CEO of the National Milk Producers Federation (NMPF), which manages CWT.
>
> "As it starts its 11th the [sic] year of operation, CWT remains the best self-help tool for the nation's dairy producers. Through today's decision, the members of CWT are recognizing how important CWT remains in help our farmers build access to the fastest-growing markets for their milk, which are overseas," said Kozak.
>
> Since the start of 2011, the CWT Export Assistance program has helped member cooperatives sell 257.7 million pounds of American-type cheeses and 111.5 million pounds of butter to 39 countries on six continents.
>
> "With the export market growing at a rate five to eight times faster than the U.S. market, the vote by CWT's member cooperatives today will ensure the U.S. is a consistent and competitive supplier of dairy products in the world's growing dairy markets," said Kozak.
>
> The Cooperatives Working Together (CWT) Export Assistance program is funded by voluntary contributions from dairy cooperatives and individual dairy farmers. The money raised by

---

[19] CWT, *CWT Export Assistance Update – Fall 2012* (Nov. 15, 2012), https://web.archive.org/web/20220815163958/http://www.cwt.coop/cwt-export-assistance-update-fall-2012/.

> their investment is being used to strengthen and stabilize the dairy farmers' milk prices and margins. For more information about CWT, visit www.cwt.coop.[20]

60. When the prior agreement to continue the program expired in 2015, CWT decided to keep offering the Export Assistance Program, announcing the decision in a press release:

> The board of directors of the National Milk Producers Federation (NMPF) today voted to continue Cooperatives Working Together, the farmer-funded export assistance program, through 2018 at the current funding level of four cents per hundredweight. NMPF developed and manages the 13-year-old self-help program, known as CWT.
>
> CWT's extension until December 31, 2018, comes at a time of increasing U.S. milk production, declining world dairy prices and increased global competition due to the removal of European Union milk quotas.
>
> "With the United States exporting the equivalent of one-seventh of its milk production, today's vote will help ensure that this country remains a consistent and competitive supplier of dairy products to the world," said NMPF Board Chairman Randy Mooney, a dairy farmer from Rogersville, MO.
>
> * * *
>
> CWT is a voluntary membership program funded by contributions from 37 dairy cooperatives and more than 100 individual farmers. The money raised from the CWT membership fee of four cents per hundredweight helps maintain U.S. exports in an increasingly competitive world market.
>
> CWT's member cooperatives submit bids requesting help with sales in specific foreign markets. Only if the amount is justified is the bid accepted and financial assistance provided. The bidder then has six months to deliver the product to the overseas purchaser.
>
> Through the first five months of 2015 alone, CWT has helped its members contract to sell 35.1 million pounds of cheese, 26.6 million pounds of butter and 20.1 million pounds of whole milk powder.

[20] CWT, *Cooperatives Working Together Members Commit to Additional Two-Year Program* (June 12, 2013), https://www.nmpf.org/cooperatives-working-together-members-commit-to-additional-two-year-program/.

> Together, these transactions will export the equivalent of 1.07 billion pounds of milk to customers in 28 countries on five continents.
>
> The Cooperatives Working Together (CWT) Export Assistance program is funded by voluntary contributions from dairy cooperatives and individual dairy farmers. The money raised by their investment is being used to strengthen and stabilize the dairy farmers' milk prices and margins.[21]

61. In June 2018, CWT's members agreed to extend the program for another three years, through 2021:

> The NMPF Board of Directors voted in early June to continue the Cooperatives Working Together (CWT) program, the historic dairy farmer self-help export assistance effort.
>
> CWT's three-year extension, through 2021, comes at a time of growing U.S. milk production, weak global dairy prices and increased worldwide competition. CWT – developed and managed by NMPF – is the only program of its kind that enables farmers to use a private enterprise that increases the competitiveness of U.S. dairy exports. CWT is funded by dairy cooperatives and individual dairy farmers, who contribute $0.04/cwt. on their milk production.
>
> "CWT is a unique and highly cost-effective tool for America's dairy farmers, and the ongoing commitment of America's farmer-owned dairy cooperatives to the program sends a signal to dairy producers at home, and dairy exporters abroad, that the United States will maintain a strong competitive stance in the global dairy market," said NMPF Chairman Randy Mooney, a dairy farmer from Rogersville, Missouri.
>
> Through the first five months of 2018, CWT has facilitated the sale of 56 million pounds of dairy products, representing the equivalent of 649 million pounds of milk. Since the export assistance program's inception in 2003, it has helped members sell 887 million pounds of dairy products, the equivalent of more than 11.1 billion pounds of milk. For more information on CWT, visit www.cwt.coop.[22]

---

[21] NMPF, *CWT to Continue Offering Dairy Farmer-Funded Export Assistance through 2018* (June 10, 2015), https://www.nmpf.org/wp-content/uploads/2015/06/CWT-Extension-Through-2018-Release-061015.pdf.

[22] NMPF, *CWT Members Vote to Continue Export Assistance Program Through 2021* (June 13, 2018), https://www.nmpf.org/cwt-members-vote-to-continue-export-assistance-program-through-2021/.

62. Taken together, these press releases reflect Defendants' agreement to continue their conspiracy to restrain the domestic milk supply. As discussed below, CWT's "revamping" into the NEXT program occurred before July 2025, when the NEXT program fully took over.

63. Defendants' conspiracy continues to this day, as their own website publicly states:

NEXT
DAIRY EXPORTS

**ABOUT**.

NMPF Exports & Trade (NEXT) is a voluntary, export-focused program managed by NMPF and designed to support the sale of U.S. dairy products to overseas customers and seek a better alignment of supply and demand for milk and milk products at home. Member cooperatives provide the funding for NEXT by contributing 2 cents per hundredweight of milk marketed.

NEXT positively impacts all U.S. dairy farmers and cooperatives by fostering the competitiveness of U.S. dairy products in the global marketplace and helping member cooperatives gain and maintain world market share for U.S. dairy products. As a result, the program has helped significantly expand the total demand for U.S. dairy products and the demand for U.S. farm milk that produces those products.

**NEXT PROGRAM FAQ.**

***Who is eligible to participate in NEXT?***

Fully participating NEXT member cooperatives marketing eligible products are qualified to apply for assistance from NEXT in exporting sales to eligible countries.

***What Products are Eligible for CWT Assistance?***

- Anhydrous Milkfat (AMF)
- Butter and Butter Blends
- Natural Cheese(s)
    - Cheddar
    - Gouda
    - Colby
    - Monterey Jack
    - Swiss/Emmentaler
    - Cream Cheese
- Pasteurized Process Cheese(s)
- Whole Milk Powder
- ESL/Asceptic Fluid Milk
- Cream
- Skim Milk Powder
- Milk Protein Concentrate

***How does the NEXT bid process work?***

NEXT member cooperatives first submit a request for export assistance specifying the product to be exported, the quantity of the product, the end customer, the county in which the customer is located, and the requested amount of assistance.

NEXT staff analyzes each bid received, considering the market in which the product will be sold, the time of delivery, and global and U.S. product prices. When the level of assistance requested is economically justified, the bid is accepted. If the analysis indicates the assistance requested is not economical, the cooperative is provided a counteroffer with the maximum level of assistance NEXT will provide. The member cooperative then has the option to accept or reject the assistance offered. If the counteroffer is accepted, the bid is modified to reflect the level of assistance NEXT will provide, assigned a reference number, dated and signed by the NEXT program facilitator.

***When does the member cooperative receive the assistance payment?***

Cooperatives do not receive payment from NEXT until documentation verifying product delivery to the end customer is received by NEXT. NEXT staff reviews the documents thoroughly, as required in the Export Assistance Operating Procedures. If the documentation is found to be in order, a request fot payment is submitted. Payment is typically made within 30 days of receiving the request for payment and the necessary supporting paperwork.

> ***Do NEXT-Assisted Export Sales displace sales made without assistance?***
>
> NEXT aims to expand sales of U.S. dairy products in world markets, not displace existing sales. If NEXT receives a claim that its assistance has displaced an unassisted export sale of a U.S. dairy product, the claim is thoroughly investigated.
>
> **MEMBERSHIP.**
>
> The NEXT program helps member cooperatives secure export sales of dairy products and supports member efforts to gain and maintain global market share. As a result, U.S. dairy farmers and their cooperatives benefit from these efforts to increase global demand for U.S. dairy products. The program is funded by voluntary contributions from dairy cooperatives. All dairy cooperatives should consider investing in NEXT.[23]

64. In an August 3, 2026 statement, Gregg Doud, now NMPF's President & CEO, said that NEXT's first full year after its revamp from CWT was "something to celebrate."[24] "NEXT improves on [CWT] in multiple ways" because it is "more targeted, more flexible and more transparent, with clear benefits that's showing through positive effects for its members."[25] From July 2025 through July 2026, "NEXT committed export assistance on more than 315 million pounds of dairy products destined for international markets. That's a 73% greater volume than in

---

[23] https://www.nmpf.org/programs/next/, (last accessed Oct. 23, 2026).

[24] https://www.nmpf.org/the-past-year-has-been-a-great-next-year/, (last accessed Oct. 23, 2026).

[25] *Id.*

2024, the last year of the CWT program, at a cost to its members that's half of the CWT assessment."[26]

**1. Export Assistance Pulled Milk Out of the Domestic Market**

65. Because of the output restrictions imposed by Defendants and their co-conspirators, prices for raw milk (both the "regulated" minimum price and the over-order price), butter, cheese, and other dairy products were supracompetitive throughout the Class Period, meaning higher than they would have been in a normally functioning, competitive market.

66. As background, milk falls into four regulatory classes, each defined by the end use of the milk or dairy product:

> **Class I** – Raw milk intended for use in making fluid milk products, such as whole milk, skim milk, cream, and the like;
>
> **Class II** – Raw milk intended for use in the manufacture of soft or "spoonable" dairy products, such as yogurt and cottage cheese;
>
> **Class III** – Raw milk intended for use in producing hard and spreadable cheeses, such as cream cheese or cheddar cheese; and
>
> Class IV – Raw milk intended for use in manufacturing other dairy products, such as butter, evaporated milk, and non-fat dry milk.

67. The Federal Milk Marketing Orders ("FMMOs") set the minimum dairy prices "which those who process dairy products, designated as handlers … must pay to dairy farmers, designated as producers" for each of these four classes of milk and dairy products. *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1342 (6th Cir. 1994).

68. The FMMOs consist of regulatory formulae used to calculate the minimum raw milk price paid to producers in each of the four classes. The formulae rest on the longstanding regulatory determination that Class III and Class IV products—chiefly butter, cheese, non-fat dry

[26] *Id.*

milk, and whey—compete in a national market. The FMMO formulae therefore set the minimum milk price at the average nationwide open market price for butter, cheese, nonfat dry milk, and whey, minus a "make allowance," multiplied by a yield factor. Depending on the time period, USDA—through its National Agricultural Statistics Service and, since 2012, its Agricultural Marketing Service—has determined the average nationwide prices for cheese, butter, and non-fat dry milk from either the prices of dairy commodities on established public exchanges or mandatory weekly price reporting under the Dairy Market Enhancement Act of 2000, 7 U.S.C. § 1637 et seq. The FMMOs' make allowances are "intended to represent the costs to the handlers of making the end dairy products from raw milk." *Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric.*, 573 F.3d 815, 818 (D.C. Cir. 2009). The Make Allowance and the Yield Factor are both fixed by regulation and are uniform throughout the country because USDA has determined that manufactured dairy products compete in a national market.

69. Federal regulation of milk prices under the Agricultural Marketing Agreement Act of 1937 ("AMAA"), 7 U.S.C. § 601 et seq., is subject to three important limitations.

70. First, "[a]lthough the AMAA mandates a minimum price, it does not mandate a maximum price." *Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 859 (9th Cir. 2013). Congress "specifically left the determination of milk prices above [the FMMO] floor to market forces." *In re Se. Milk Antitrust Litig.*, No. 2:08-MD-1000, 2008 WL 2368212 (E.D. Tenn. June 6, 2008), *quoted in First Impressions Salon, Inc. v. Nat'l Milk Producers Fed'n*, 214 F. Supp. 3d 723, 733 (S.D. Ill. 2016). The amount by which the actual negotiated price for milk exceeds the minimum price set by the applicable FMMO is commonly called the "over-order premium." Market forces determine whether a seller can charge over-order premiums. A seller with substantial market power, facing a constricted milk supply, can extract a premium to meet a buyer's demand for milk.

Market power grows when agricultural cooperatives conspire to raise prices and when collusive cooperative strategies reduce milk production.

71. Second, the FMMOs issued under the AMAA are intended to regulate only the price of raw milk. Federal law does not regulate the price of products made from raw milk, such as butter and cheese.

72. Third, the AMAA does not displace competition among producers beyond the minimum prices it establishes. Milk marketing orders may not limit the marketing of milk or milk products produced in any production area in the United States. *See* 7 U.S.C. § 608c(5)(G). And the AMAA's antitrust protection for agreements among producers and handlers extends only to marketing agreements that the Secretary of Agriculture enters into after due notice and an opportunity for a hearing. *See* 7 U.S.C. § 608b(a).

73. On information and belief, the Secretary of Agriculture has not entered into any marketing agreement under 7 U.S.C. § 608b that covers the Cooperatives Working Together Export Assistance program.

74. Against this backdrop, the Export Assistance Program proved highly effective at shifting U.S. dairy away from domestic consumption and into international exports.

75. USDA data on U.S. cheese exports, measured both as a share of production and by total volume, show that exports have grown substantially since CWT began its Export Assistance program in 2003, including throughout the Class Period.[27]

---

[27] USDA Economic Research Service, *Dairy Data*, https://ers.usda.gov/data-products/dairy-data; USDA National Agricultural Statistics Service, *Quick Stats*, https://quickstats.nass.usda.gov/.

**D. Less Domestic Supply Means Higher Milk Prices**

76. It is well recognized that, in the dairy market, a substantial decrease in the raw milk supply immediately pushes up the unregulated market price of butter and cheese in the national wholesale market for those products. Through the FMMO formulae, that price increase is automatically reflected in a higher regulated minimum price for raw milk. A significant restriction in the raw milk supply will also necessarily raise the regulated minimum price of raw milk, the unregulated over-order price of raw milk, the unregulated price of butter, and the unregulated price of cheese.

77. In turn, removing milk from the domestic supply by converting it into cheese and other dairy products and exporting those products en masse had the necessary and intended effect of raising the unregulated prices of those products in the national market.

78. Defendants have said as much themselves. In NMPF's 2018 Activities and Accomplishments Report, they stated: "By focusing CWT assistance on products that most directly impact dairy farmers' milk prices, CWT sales over the last seven years have improved dairy farmer milk prices by an estimated average of $0.36/cwt. per year – a return nine times the investment that CWT member producers have made in the program." In that statement, Defendants acknowledged that they designed the program to target the specific dairy products that would most significantly affect raw milk prices, and they estimated that this targeting had a large effect.[28]

79. These effects have only grown since 2010, when CWT ended the Herd Retirement program—conduct later challenged in the prior antitrust litigation described in this Complaint—and devoted itself entirely to Export Assistance.

[28] NMPF, *2018 Activities & Accomplishments Report*, https://www.nmpf.org/wp-content/uploads/2019/04/AAReport18web.pdf.

## E. The Structure of the Dairy Industry Makes Collusion Feasible

### 1. A Small Number of Cooperatives Dominate Production

80. Although CWT has more than two dozen members, U.S. dairy production is highly concentrated.

81. Dairy cooperatives have consolidated significantly. In 2022, just 89 cooperatives accounted for 87% of marketed milk and milk products in the United States, down from more than 2,400 cooperatives in the late 1920s, a decline of over 96%.[29]

82. The same consolidation extends to the farms themselves. The average U.S. dairy operation grew from 112 cows in 2000 to 283 cows in 2021. From 2002 to 2022, the number of dairy farms with fewer than 1,000 cows fell, while the number with 1,000 or more cows rose by around 60%. As herds became larger, the total number of licensed U.S. dairy herds dropped sharply, by 63%, from 66,825 in 2004 to 24,811 in 2024.[30]

83. These market changes mean that fewer farms are producing more milk overall. Between 2017 and 2022, the number of farms selling cow's milk dropped by 39%, even as total cow milk sales grew by 44%; over the same period, the number of milk cows declined only 2.4%, to 9.3 million at the end of 2022.[31]

84. Defendant Dairy Farmers of America, a CWT member and the largest of these cooperatives, has marketed roughly 30% of the U.S. milk supply. *See* Hoard's Dairyman, *DFA Would Rank 159 on the Fortune 500 List* (Mar. 23, 2015), https://hoards.com/article-15343-dfa-

---

[29] Congressional Research Service, *Overview of Dairy Cooperatives* (Nov. 26, 2024), https://www.congress.gov/crs_external_products/R/PDF/R48285/R48285.1.pdf.

[30] USDA Economic Research Service, *Fewer Farms, More Milk: The Changing Structure and Costs of U.S. Dairy Farming* (Feb. 23, 2026), https://www.ers.usda.gov/amber-waves/2026/february/fewer-farms-more-milk-the-changing-structure-and-costs-of-us-dairy-farming.

[31] USDA 2022 Census of Agriculture, *Dairy Cattle and Milk Production*, https://www.nass.usda.gov/Publications/Highlights/2024/Census22_HL_Dairy.pdf.

would-rank-159-on-the-fortune-500-list.html (DFA "marketed 63.7 billion pounds of milk" in 2014, or "31 percent of the U.S. milk supply"). It describes itself as "the largest supplier of raw milk in the world, the third largest global dairy company and the largest U.S. dairy company."[32] That position is partly the product of heavy consolidation and an aggressive merger strategy, which during the Class Period included the acquisition of two major horizontal competitors: St. Albans Creamery in Vermont and Dean Foods, which operates across the entire United States.

85. The Dean Foods acquisition raised concerns that Dairy Farmers of America was becoming an unmanageable monopoly in the Relevant Market. The United States Department of Justice required a divestiture,[33] and the acquisition also prompted monopolization litigation under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.[34]

86. Other CWT members also hold dominant positions in the Relevant Market within their own geographic areas. Dairy Farmers of America, for example, expanded its base of member farms in New England, and in Vermont in particular, through its 2019 merger with St. Albans Cooperative Creamery.

**2. New Competitors Cannot Easily Enter**

87. Barriers to entry are obstacles that keep new competitors from easily entering a market. They limit competition and make it easier for incumbent firms to collude.

---

[32] DFA, *Working for a Cooperative*, https://web.archive.org/web/20220702121541/https://www.dfamilk.com/careers/what-is-a-cooperative.

[33] *See generally*, *United States of America et al. v. Dairy Farmers of America*, Case No. 1:20-cv-02658 (N.D. Ill. 2020); DOJ press release, *Justice Department Requires Divestitures as Dean Foods Sells Fluid Milk Processing Plants to DFA out of Bankruptcy* (May 1, 2020), https://www.justice.gov/opa/pr/justice-department-requires-divestitures-dean-foods-sells-fluid-milk-processing-plants-dfa.

[34] *See generally*, *Food Lion, LLC et al. v. Dairy Farmers of America, Inc. et al.*, Civil Action No. 1:20-cv-00442 (M.D.N.C. 2020).

88. Under basic economic principles, a collusive arrangement that lifts prices above competitive levels would draw new entrants hoping to capture the profits available from supracompetitive pricing. Where entry barriers are significant, however, new entrants are less likely to come into the market. Barriers to entry therefore help cartels form and endure.

89. Barriers to entry have kept, and continue to keep, would-be competitors out of the Dairy industry, including the construction of plants and processing centers; the high cost of, and need for, moving perishable Dairy products quickly; the time and space required to raise cows for milk production; and the high cost of marketing Dairy products for sale to end users such as Plaintiff and members of the putative Class.

90. Because they are relatively insulated from the threat of new competition, Defendants have been able to sustain their conspiracy through CWT, and potentially through other means that discovery in this Action may reveal.

**3. Dairy Products Are Interchangeable Commodities**

91. A commodity is a basic good used in commerce that is interchangeable with other goods of the same type. Commodities are most often used as inputs to produce other goods.

92. Commodity markets are particularly susceptible to collusion. Demand for a commodity turns primarily, if not exclusively, on price rather than on other attributes such as product quality or customer service, which makes it easier for cartel members to monitor compliance and detect defectors.

93. Because price differences among commodities cannot readily be explained by other factors, such as special product features, quality, reliability, or durability, any observed price discrepancy is more likely to expose cheating.

94. Milk is a commodity in exactly this sense.

95. For example, the milk Defendants produce is virtually indistinguishable in appearance and nearly identical in nutritional content. The USDA treats dairy products as commodities, publishing the daily cash trading of butter, cheese, nonfat dry milk, and dry whey on its website.[35]

96. Commodities markets likewise treat other dairy products, such as cheese, as commodities; blocks of cheddar cheese, for example, are bought and sold as commodities on the Chicago Mercantile Exchange.[36]

**4. Consumers Keep Buying Dairy When Prices Rise**

97. Price elasticity measures how sensitive suppliers or consumers are to changes in the price of a good or service. Demand is inelastic when a price increase causes only a small decline, if any, in the quantity of the product sold.

98. A cartel can profit from raising prices above competitive levels only if demand is relatively inelastic at competitive prices. Otherwise, higher prices would cause sales, revenues, and profits to fall as customers switch to substitutes or stop buying altogether.

99. When demand is inelastic, customers have no cheaper alternative of similar quality to turn to, and they keep buying even after prices rise.

100. Inelastic demand is therefore a market characteristic that facilitates collusion, because it lets producers raise prices without driving customers to substitutes or losing sales revenue.

---

[35] USDA Agricultural Marketing Service, *Chicago Mercantile Exchange - Cash Dairy Markets*, https://www.ams.usda.gov/market-news/chicago-mercantile-exchange-cash-dairy-markets.

[36] *See* Cheese Market News, *Daily/Weekly Market Activity*, https://www.cheesemarketnews.com/markets/dailymarkets.html.

101. Demand for dairy is relatively insensitive to price changes. "[D]emand for dairy products is relatively inelastic at the aggregate level[.]"[37] Consumers and other purchasers, including Plaintiff and members of the putative Class, buy dairy products in a market in which demand for those products is relatively inelastic. Indeed, "[a]s a general rule, the demand for dairy products is rather inelastic as most of the studies report price elasticity lower than 1."[38]

102. Studies of U.S. market data confirm this. One research paper analyzing demand for farm milk in the United States estimated an own-price elasticity of demand of approximately -0.80.[39]

103. Defendants' own position is consistent with this characterization. In the 2023-24 National Federal Milk Marketing Order Pricing Formula Hearing, Dr. Scott Brown, testifying for NMPF, submitted the following own-price elasticities of demand by product: butter, -0.08; American cheese, -0.23; cheese other than American, -0.22; fluid milk, -0.12; nonfat dry milk, -0.13; other milkfat, -0.12; and other skim solids, -0.05. Every one of these figures is below 1.0 in absolute value, confirming that demand for each dairy product category at issue is inelastic.[40]

---

[37] Zohra Bouamra-Mechemache, Vincent Requillart, Claudio Soregaroli, and Audrey Trevisiol, *Demand for dairy products in the EU*, Toulouse School of Economics (Nov. 2007), http://idei.fr/sites/default/files/medias/doc/wp/2007/eu_dairy_demand.pdf.

[38] *Id.*

[39] Wei Zhang and Julian M. Alston, *The Demand for Inputs and Technical Change in the U.S. Dairy Manufacturing Industry*, Agricultural and Resource Economics Review (2018), https://www.cambridge.org/core/journals/agricultural-and-resource-economics-review/article/demand-for-inputs-and-technical-change-in-the-us-dairy-manufacturing-industry/CE21B9A47917A404C7EED6CAC7394960.

[40] Scott Brown, Ph.D., Univ. of Missouri College of Agriculture, Food & Nat. Res., *Analysis of Federal Milk Market Order Policy Options*, https://www.ams.usda.gov/sites/default/files/media/FMMO_NMPF_60A.pdf.

104. As a result, notwithstanding the price increases caused by the conspiracy, Plaintiff and Class members were, and still are, compelled to buy dairy products because no suitable replacements exist.

**5. Defendants Have Had Repeated Opportunities to Coordinate**

105. Defendants have had opportunities to collude in the Relevant Market, including but not limited to:

a. Trade association meetings among Defendants;

b. Joint annual meetings held by NMPF, including but not limited to:

i. The joint annual meeting held in Las Vegas on November 14-17, 2021, which some or all of the Defendants or their representatives attended.[41]

ii. The joint annual meeting held near Denver on October 23-26, 2022, which some or all of the Defendants or their representatives attended.[42]

iii. The joint annual meeting held in Orlando on November 12-15, 2023, which some or all of the Defendants or their representatives attended.[43]

---

[41] Joint Annual Meeting webpage, November 14-17, 2021, https://web.archive.org/web/20211213014202/https://annualmeeting.dairy.org/#/Summary; NMPF, *2021 Annual Meeting to Make Every Drop Count* (Nov. 3, 2021), https://www.nmpf.org/2021-annual-meeting-to-make-every-drop-count/.

[42] Joint Annual Meeting webpage, October 23-26, 2022, https://web.archive.org/web/20230402112016/https:/annualmeeting.dairy.org/#/Summary#%2FSummary; NMPF, *NMPF Annual Meeting to Focus on Keys to Dairy's Future*, https://www.nmpf.org/nmpf-annual-meeting-to-focus-on-keys-to-dairys-future/.

[43] Joint Annual Meeting webpage, November 12-15, 2023, https://web.archive.org/web/20231207095820/https:/annualmeeting.dairy.org/#/Summary#%2FSummary; NMPF, *Joint Annual Meeting to Detail Policy, Industry Highlights* (Nov. 7, 2023), https://www.nmpf.org/joint-annual-meeting-to-detail-policy-industry-highlights/.

iv. The joint annual meeting held in Arlington, Texas on Nov. 10-12, 2025, which all or some of the Defendants or their representatives attended.[44]

v. The joint annual meeting held in Kissimmee, Florida on October 19-21, 2026, which, on information and belief, all or some of the Defendants or their representatives attended.[45]

c. Reports exchanged among Defendants, including NMPF's reports, podcasts, and other statements to its members, many of which are Defendants;[46]

d. Joint ventures involving Defendants, including (a) the joint venture among Defendant Dairy Farmers of America, its horizontal competitor Select Milk Producers, Inc., and Glanbia Nutritionals, which operates a cheese and whey plant in St. Johns, Michigan that was completed in fall 2020;[47] and (b) the joint venture between horizontal competitors Defendant Dairy Farmers of America and California Dairies, Inc.;[48] and

---

[44] Joint Annual Meeting webpage, November 10-12, 2025, https://www.nmpf.org/tag/2025-joint-annual-meeting/.

[45] Joint Annual Meeting webpage, October 19-21, 2026, https://web.cvent.com/event/7f55714c-4baa-4b83-9d12-f83cc1756a6f/summary#/Summary

[46] *See, e.g.*, NMPF, *Dairy Defined Podcast: Price Forecast Positive for Dairy, NMPF's Vitaliano Says* (Jan. 10, 2022), https://www.nmpf.org/dairy-defined-podcast-price-forecast-positive-for-dairy-nmpfs-vitaliano-says/.

[47] *See* "DFA reports 2020 financial results" (Mar. 29, 2021), https://www.feedstuffs.com/market-reports/dfa-reports-2020-financial-results.

[48] *See* California Dairies, Inc., *California Dairies, Inc. and Dairy Farmers of America Create a Marketing Agency in Common to Ensure Market Stability* (July 10, 2019), https://www.californiadairies.com/press-release/california-dairies-inc-and-dairy-farmers-of-america-create-a-marketing-agency-in-common-to-ensure-market-stability/.

e. Consolidation by Defendants, including Defendant Dairy Farmers of America's acquisition of Dean Foods during the Class Period[49] and its acquisition of St. Albans during the Class Period.[50]

### F. Each Export-Assisted Product Is a Distinct Market

106. The Relevant Product Market consists of the markets for the processed dairy products that received Defendants' export assistance during the Class Period, together with the upstream pasteurized milk market. These include the markets for pasteurized milk, cheese, butter, whole milk powder, cream cheese, and anhydrous milkfat (collectively, the "Relevant Products") sold throughout the United States.

107. Each Relevant Product is a finished dairy product made with fluid milk as an input, but each is a separate product market. Purchasers do not regard butter, cheese, whole milk powder, cream cheese, and anhydrous milkfat as reasonably interchangeable with one another.

a. ***Butter.*** In *United States v. Dairy Farmers of America, Inc. et al.*, the DOJ alleged that butter has "specific characteristics (e.g., flavor, texture, certain cooking attributes, and blending abilities), unmatched by other products," including margarine. The DOJ also alleged that "if the price of butter were increased by a small but significant amount, a sufficient number of purchasers would not switch to other products to make such a price increase unprofitable."[51]

---

[49] *See* U.S. Dep't of Justice, Press Release No. 20-420, *Justice Department Requires Divestitures as Dean Foods Sells Fluid Milk Processing Plants to DFA out of Bankruptcy* (May 1, 2020), https://www.justice.gov/opa/pr/justice-department-requires-divestitures-dean-foods-sells-fluid-milk-processing-plants-dfa.

[50] *See* American Agriculturist, *St. Albans Creamery Co-op joins Dairy Farmers of America* (Aug. 5, 2019), https://www.farmprogress.com/dairy-cattle/st-albans-creamery-co-op-joins-dairy-farmers-of-america.

[51] *United States v. Dairy Farmers of America, Inc., Societe de Diffusion Internationale Agro-Alimentaire, and SODIAAL North America Corp.*, No. CN00-CV-1663, Verified Compl. ¶ 14 (E.D. Pa. filed Mar. 31, 2000), https://www.justice.gov/atr/case-document/file/493486/dl.

b. ***Cheese.*** Defendants' export assistance program covers natural cheese, specifically Cheddar, Gouda, and Monterey Jack. In *United States v. B.S.A. S.A. (Lactalis) and The Kraft Heinz Company*, the DOJ took the position that feta cheese and ricotta cheese are each separate relevant product markets, distinct from other natural cheese varieties, consistent with how suppliers and the industry recognize these specialty products.[52] American cheeses are not distinguished in the same way at the industry level; the National Agricultural Statistics Service reports Cheddar and Monterey Jack together under a single category of "American types" of cheese. Gouda, with its European-style characteristics, is classified separately. Defendants' export assistance for cheese therefore affects two relevant product markets: American-type cheese (Cheddar and Monterey Jack) and Gouda.

c. ***Whole Milk Powder, Cream Cheese, and Anhydrous Milkfat.*** Whole milk powder, cream cheese, and anhydrous milkfat, the other dairy products that received Defendants' export assistance, are likewise separate relevant product markets, distinct from the Relevant Products described above and from each other.

## G. Raw Milk Is the Common Upstream Input

108. Milk is the essential upstream input for every dairy product. It can be allocated among manufactured dairy products according to their relative profitability, or it can remain fluid milk and be sold into the market. By subsidizing exports of certain manufactured dairy products, Defendants' program made it more profitable to turn raw milk into processed dairy products for export rather than for domestic sale, encouraging the diversion of raw milk away from the downstream fluid milk market and from domestic processed dairy. This reallocation shrank the

---

[52] *United States v. B.S.A. S.A. (Lactalis) and The Kraft Heinz Company*, Civil Action No. 1:21-cv-02976 (D.D.C. 2021).

raw milk supply available to every downstream market, raising the price of raw milk and, in turn, the price of every product made from raw milk in the domestic market.

109. The Department of Justice has likewise treated fluid milk as its own market. In *United States et al. v. Dairy Farmers of America, Inc. and Dean Foods Company*, the DOJ stated that "the processing and sale of fluid milk is a relevant product market and line of commerce under Section 7 of the Clayton Act." Demand for fluid milk is inelastic, and "a hypothetical monopolist processing and selling fluid milk likely would impose a small but significant and non-transitory price increase (e.g., five percent) because an insufficient number of customers would switch to alternatives to make that price increase unprofitable."[53]

**H. The Geographic Market Is National**

110. The Relevant Geographic Market is the entire United States, consistent with USDA's longstanding regulatory treatment of dairy product markets. As alleged above, the Make Allowance and Yield Factor used in the FMMO formulae are uniform nationwide because USDA has determined that manufactured dairy products compete in a national market. Defendants' export assistance program was national in scope as well: CWT's many member cooperatives are located across the United States and collectively account for a substantial share of the domestic milk supply.

111. The U.S. domestic market is a geographic market distinct from foreign export markets. Neither direct purchasers of Defendants' dairy products nor end consumers can readily substitute dairy products available in foreign markets for those sold in the United States. A hypothetical U.S. monopolist in each of the product markets defined above could therefore

---

[53] *See Proposed Final Judgment and Competitive Impact Statement*, https://www.federalregister.gov/documents/2020/06/02/2020-11857/united-states-et-al-v-dairy-farmers-of-america-inc-and-dean-foods-company-proposed-final-judgment.

profitably raise prices 5-10% above a competitive level without meaningful substitution to foreign dairy products.

112. This is partly a function of import regulation and is confirmed by the USDA. As a practical matter, resellers and consumers cannot simply buy milk and dairy products from another country, because those products are perishable and subject to import restrictions. In particular, the federal government imposes a variety of import restrictions on milk and dairy products that apply to importers and individual travelers alike.[54] Those restrictions are meant both to protect the domestic dairy industry and to control the spread of disease. Accordingly, the USDA defines a nationwide market that excludes foreign dairy producers.[55]

113. Many of the dairy products imported into the United States are specialized products that compete in distinct product markets. Italian parmesan imported into the United States, for example, occupies a different product market from American cheddar because it serves different culinary purposes, and demand between the two products is therefore of limited elasticity. Put simply, many imported dairy products are imported precisely because they differ from what U.S. producers make, which is what justifies the high cost of bringing them into the U.S. market. Treating all U.S. dairy imports as competing with Defendants in a single relevant market would therefore be a mistake that understates U.S. producers' market power.

---

[54] *See* USDA Animal and Plant Health Inspection Service, *International Traveler: Milk, Dairy, and Egg Products*, https://www.aphis.usda.gov/traveling-with-ag-products/milk-dairy-eggs; 9 CFR § 94.16 Milk and milk products, https://www.ecfr.gov/current/title-9/chapter-I/subchapter-D/part-94/section-94.16; U.S. Customs and Border Protection, *What are the regulations for importing dairy products?*, https://www.help.cbp.gov/s/article/Article-1071?language=en_US.

[55] *See* Dep't of Agriculture, AMS Final Decision, 78 Fed. Reg. 9248 (Feb. 7, 2013), "Cheese, butter, dry whey and NFDM compete in a national marketplace," https://www.govinfo.gov/content/pkg/FR-2013-02-07/pdf/2013-02623.pdf; AMS Recommended Decision, 82 Fed. Reg. 10634, 10667 (Feb. 14, 2017), "commodity products produced in California compete in the same national market as products produced throughout the country," https://www.govinfo.gov/link/fr/82/10634.

114. Market definition in antitrust litigation asks what the relevant scope of competition is for evaluating Plaintiff's claims, and it answers that question by asking whether a hypothetical monopolist of the candidate market could profitably exercise market power. Domestic and foreign markets are related, and their prices and production may influence one another (as CWT's Export Assistance does), but that relationship is not the question market definition asks. As alleged here, a hypothetical U.S. monopolist in each defined product market could profitably exercise market power without profit-defeating substitution to foreign dairy producers. The relevant geographic market is therefore limited to the United States, and any positive effects of EAP on foreign markets that Defendants may later assert as a defense would be out-of-market efficiencies properly excluded from a rule-of-reason analysis. As the next section explains, Plaintiff further alleges that no procompetitive justification redeems the EAP.

## I. Harm to Competition and to Consumers

### 1. Export Subsidies Are Anticompetitive, and CWT's Version Is Worse

115. Export subsidies are widely recognized as harmful to competition, and the structure of CWT's Export Assistance makes those anticompetitive effects worse. A government-funded export subsidy may encourage domestic firms to increase production somewhat, but economists expect such subsidies, on balance, to reduce domestic supply by redirecting goods abroad.[56] The result is a loss of welfare: domestic supply becomes inefficiently low, pushing domestic prices above competitive levels, while foreign prices may become inefficiently low, depressing foreign production and potentially harming the competitive process abroad as well as at home.[57] For these

---

[56] World Trade Organization, *World Trade Report 2006*, at p. 57, Box 3, https://www.wto.org/english/res_e/booksp_e/anrep_e/wtr06-2c_e.pdf.

[57] *Id.* at pp. 57-58; Sykes, A. O. (2003), *The Economics of WTO Rules on Subsidies and Countervailing Measures*, John M. Olin Law & Economics Working Paper No. 186 (2d series), University of Chicago Law School, at p. 9,

reasons, World Trade Organization (WTO) members have long prohibited government export subsidies on industrial products and, in 2015, agreed to eliminate them for agricultural products as well, recognizing that such policies are anticompetitive.[58] WTO rules govern member governments, not private parties such as CWT, and so do not reach CWT's program. But the economic concerns behind those rules apply at least as strongly to an export subsidy funded by horizontal competitors. Indeed, foreign dairy producers have already complained that CWT's Export Assistance distorts competition and, because it is privately financed, avoids the prohibitions on government-financed export subsidies found in trade agreements such as the Trans-Pacific Partnership.[59]

116. Even if government-funded export subsidies had some redeeming features, the economic incentives and effects created by CWT's EAP are worse still and have no procompetitive justification. A government-funded subsidy injects new money into a particular sector, paid for by taxes collected elsewhere, to encourage production in that sector. EAP injects no new money into dairy production; dairy farmers fund it themselves in a closed loop. Rather than an outside infusion of capital to spur production, EAP is a concerted exchange of funds among horizontal competitors, who pay one another to redirect supply from the domestic market to foreign export markets without a commensurate increase in production. Because EAP is a closed loop among competitors, no new capital encourages them to produce more, and the primary reason to fund the

---

https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=1515&context=law_and_economics.

[58] World Trade Organization, *Export subsidies and other export support measures*, https://www.wto.org/english/tratop_e/agric_e/factsheetagric17_e.htm.

[59] ADIC and Dairy Australia, Submission to the Senate Foreign Affairs, Defence and Trade References Committee (Trans-Pacific Partnership Inquiry) (Oct. 2016), https://www.aph.gov.au/DocumentStore.ashx?id=23b586a3-299b-4f84-9bb0-6141291ab14b&subId=459442 ("dairy farmer funded Cooperatives Working Together (CWT) export subsidy program").

subsidy is that it serves as a collusive mechanism: it allows CWT members to raise domestic prices by more than it costs them to fund one another's subsidies.

117. The difference between a government-funded subsidy and a self-funded one further undercuts any redeeming qualities an export subsidy might have, and export subsidies are already harmful enough that WTO members have agreed to eliminate government-funded ones. In short, if government-funded export subsidies are distorting enough that WTO members have agreed to abandon them, an agreement among horizontal competitors to fund one another's export subsidies, with the expressly stated goal of raising domestic prices, deserves at least as much scrutiny. Plaintiff brings this putative class action to obtain that scrutiny.

**2. The Export Assistance Program Raised Domestic Milk Prices**

118. Defendants' conduct has artificially inflated the over-order prices of raw milk, as well as the prices of butter and cheese, in the United States. By manipulating the cheese supply through an agreement to carry out and pay for mass exports, Defendants have held the prices of raw milk, butter, and cheese at artificially high levels throughout the United States, and purchasers of raw milk, butter, cheese, whole milk powder, cream cheese, and anhydrous milkfat have consequently paid supracompetitive prices.

119. As alleged above, CWT itself has said that the Export Assistance Program "improves" the balance of supply and demand in favor of higher milk prices for dairy farmers. Estimates CWT has cited place the overcharge as high as $0.50 per hundredweight, and at an average of $0.36 per hundredweight per year over a seven-year period.

**3. Retail Prices Followed Farm Prices**

120. The effect of the supracompetitive prices for these products did not stop with direct purchasers. Because raw milk is an essential input for every Relevant Product, the inflated raw milk price increased the cost of making and selling the Relevant Products in the United States.

Those cost increases were passed through every stage of the distribution chain to consumers who bought the products for their own use. Several market features, described below, would have made this pass-through sustainable.

121. Retail milk prices track farm milk prices closely:

a. The U.S. Government Accountability Office analyzed monthly prices for 2 percent milk at the farm, cooperative, wholesale, and retail levels in 15 markets from October 2000 through May 2004 and found that price changes generally correlated across levels of the marketing chain.[60]

b. While CWT's herd retirement program was in effect, retail prices moved nearly one-for-one with farm prices. In Atlanta, Miami, Philadelphia, Pittsburgh, St. Louis, and Kansas City, every $1 increase in the farm price corresponded to a retail increase of approximately $1 or more. Retail milk purchasers paid higher prices in almost every city studied, and the share of farm milk price increases passed through to retail grew while the program was in place.[61]

c. Peer-reviewed research by economists at USDA's Economic Research Service similarly finds that farm and retail prices for whole milk and Cheddar move together over the long run.[62]

---

[60] U.S. Government Accountability Office, *Dairy Industry: Information on Milk Prices, Factors Affecting Prices, and Dairy Policy Options*, GAO-05-50, Dec. 2004, app. II, at 24, 27–30 & tbls. 3–5, www.gao.gov/assets/gao-05-50.pdf.

[61] Bolotova, Y., *Fluid Milk Pricing and Market Power in the U.S. Dairy Industry*, 2022, Selected Paper, Agricultural & Applied Economics Association Annual Meeting, Appendix II, Table 1, https://ageconsearch.umn.edu/record/322069/files/22472R2.pdf.

[62] Hayden Stewart & Don P. Blayney, *Retail Dairy Prices Fluctuate with the Farm Value of Milk*, 40 Agric. & Res. Econ. Rev. 201, 215 (2011), https://ageconsearch.umn.edu/record/117772.

d. Together with CWT's own estimates of the program's effect on farm milk prices, this evidence is consistent with the mechanism alleged in this Complaint: CWT's export program raised farm milk prices, and those higher farm prices were reflected in turn in higher retail prices for dairy products.

**4. Consumers and Retailers Could Not Avoid the Overcharge**

122. Milk, cheese, and butter are household staples with few reasonable substitutes outside their own categories. Consumers may switch among varieties within a market, but by raising raw milk prices, Defendants' conduct raised prices for every variety in each market at once. Retail demand for fluid milk is highly inelastic in each of the ten federal milk marketing order regions examined in a study NMPF itself submitted to the USDA.[63]

123. Each Relevant Product is a relevant product market because a hypothetical monopolist could profitably impose a small but significant non-transitory price increase; too few consumers would switch to other products to make the increase unprofitable. Likewise, sellers at every level of the distribution chain could raise prices in response to the overcharge without losing enough sales to make the increase unprofitable.

124. Retailers' bargaining power did not protect consumers from the overcharge. Because raw milk is a fungible input common to every Relevant Product, Defendants' conduct raised costs for nearly every supplier at the same time, leaving retailers few lower-priced

[63] Cakir, M. and Balagtas, J., *Estimating Market Power of U.S. Dairy Cooperatives in the Fluid Milk Market*, Apr. 2012, American Journal of Agricultural Economics, Vol. 94(3), pp. 647-658, at pp. 654–655 and Table 3. Submitted by NMPF as Exhibit NMPF-110 in USDA's national Federal Milk Marketing Order pricing hearing, www.ams.usda.gov/sites/default/files/media/FMMO_NMPF_110.pdf.

alternatives. Facing the same constraints, retailers had no incentive to absorb the price increases out of their own margins.

125. As alleged above, each Relevant Product is a distinct relevant product market, and the relevant geographic market is the United States, because dairy products compete in a national market. Because the FMMO pricing formulae transmit wholesale price changes to every region of the country, Defendants' coordinated conduct affected dairy prices nationwide, including the retail prices of other products made from raw milk, such as yogurt and ice cream.

### J. The Capper-Volstead Act Does Not Protect This Conduct

126. The Capper-Volstead Act, enacted in 1922 as the Co-operative Marketing Associations Act (P.L. 67-146) (7 U.S.C. §§ 291, 292), exempts certain agricultural producers from the antitrust laws when they act together "in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce" their agricultural products. Capper-Volstead Act, § 1. Such agricultural cooperative "associations and their members may make the necessary contracts and agreements to effect such purposes." *Id.*

127. The Capper-Volstead Act permits these producers, acting through a cooperative association, to agree on prices and terms of sale, market jointly, agree with other cooperatives on common marketing practices, and engage in other combined activities that promote market efficiency, all of which would otherwise violate the Sherman Antitrust Act.

128. Capper-Volstead immunity is not absolute. It covers only organizations or cooperatives whose members are exclusively producers of agricultural products and that process, prepare for market, handle, or market their members' agricultural products.

129. Capper-Volstead also requires that protected associations be "operated for the mutual benefit of the members thereof, as such producers," and that they satisfy at least one of two further conditions: that "no member of the association is allowed more than one vote because of

the amount of stock or membership capital he may own therein," or that the association "does not pay dividends on stock or membership capital in excess of 8 per centum per annum." 7 U.S.C. § 291. The Act's limited protections disappear unless the organization engaged in the coordinated conduct consists exclusively of producers. If even one member of a cooperative organization is not a producer, the Act's limited protection does not apply. And even where an individual producer independently qualifies as a Capper-Volstead entity, it forfeits Capper-Volstead immunity by conspiring with a non-Capper-Volstead entity.

130. CWT does not meet that requirement. Its members include non-producers such as National Farmers Organization, whose membership includes entities that produce no milk.

131. Independently, the Capper-Volstead Act by its plain terms grants no immunity for pre-production output restraints. Congress gave cooperatives the power to help producers market the available supply of agricultural products, not the power to restrict that supply. USDA has itself acknowledged in various published documents that it is illegal for cooperatives to restrain their members' production. The Export Assistance Program that CWT and its members orchestrated sought to restrain the raw milk supply, eliminate competition, and thereby artificially inflate the prices of cheese and other dairy products. CWT and its members are therefore not entitled to the Capper-Volstead Act's protections.

132. The activities of CWT and its members, including Defendants, described in this Complaint were anticompetitive and predatory. The challenged arrangement is not the kind of collective processing, preparing for market, handling, or marketing that the Capper-Volstead Act protects. CWT does not take title to, process, or sell its members' products; its members make their own export sales. CWT instead collects assessments from competing cooperatives and producers and uses them to pay members to divert product out of the domestic market, for the

purpose of raising domestic prices for all of them. That horizontal subsidy arrangement does not promote market efficiency and has no legitimate business justification. Its purpose was, and still is, to reduce the supply of raw farm milk available in the United States and drive up the prices of dairy products such as cheese.

133. CWT and its members therefore do not enjoy Capper-Volstead's limited immunities, and neither does NMPF, which created, and conspired with, a non-exempt entity.

## V. CLASS ACTION ALLEGATIONS

134. Plaintiff brings this action individually and as a representative of all others similarly situated, under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), on behalf of the following Class:

> All natural persons and entities who, from January 1, 2018, through the present, indirectly purchased dairy products (including but not limited to fluid milk, cheese, butter, yogurt, ice cream, and other dairy products), other than directly from a Defendant, for personal consumption or end use in the states identified in Counts II and III below (the "Class").

Plaintiff reserves the right to amend the Class definition, and the definitions of any state-specific subclasses, as discovery and further investigation warrant.

135. The Class excludes Defendants' officers, directors, and employees; any entity in which a Defendant has a controlling interest; and Defendants' affiliates, legal representatives, attorneys, successors, heirs, and assigns. The Class also excludes the judicial officers to whom this case is assigned, their families, and their staff members.

136. Class-wide treatment of Plaintiff's claims is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis with the same evidence that would be used to prove those elements in individual actions asserting the same claims.

137. ***Numerosity – Federal Rule of Civil Procedure 23(a)(1).*** The Class is so numerous that joinder of all Class members is impracticable. On information and belief, the Class includes

millions of consumers and other end users who bought dairy products at retail during the Class Period. Although Plaintiff does not yet know the precise number or identities of Class members, that information can be determined from Defendants' records and third-party transaction data. Class members can be notified of the pendency of this action through recognized, Court-approved notice methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

138. ***Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).*** Questions of law and fact common to all Class members exist and predominate over any questions affecting only individual members. These common questions include, without limitation:

a. Whether Defendants conspired to restrain trade;

b. Whether Defendants contracted to restrain trade;

c. Whether Defendants agreed to restrain trade;

d. Whether Defendants are entitled to the Capper-Volstead exemption's limited protections;

e. Whether the conduct alleged in this Complaint affected interstate commerce;

f. The extent to which Plaintiff and putative Class members were harmed;

g. Whether injunctive relief is appropriate to remedy the harm to Plaintiff and putative Class members;

h. Whether Defendants' overcharges passed through the distribution chain to indirect purchasers;

i. Whether Plaintiff and Class members suffered injury by paying artificially inflated prices for dairy products; and

j. The proper measure of damages and of the overcharges passed through to indirect purchasers.

139. Defendants engaged in a common course of conduct that gives rise to the legal rights Plaintiff seeks to enforce for himself and the other Class members. The statutory and common law violations, business practices, and injuries at issue are similar or identical across the Class. Any individual questions pale in comparison, in both quality and quantity, to the many common questions that dominate this action.

140. ***Typicality – Federal Rule of Civil Procedure 23(a)(3).*** Plaintiff's claims are typical of other Class members' claims because, among other things, all of them arise from the same wrongful course of conduct by Defendants alleged in this Complaint. Like every Class member, Plaintiff bought dairy products at retail at prices artificially inflated by Defendants' anticompetitive conduct, and his injuries arise from the same unlawful conduct and rest on the same legal theories as the injuries of the Class.

141. ***Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).*** Plaintiff will adequately represent the Class because he is a Class member and his interests do not conflict with those of the Class members he seeks to represent. Plaintiff has retained counsel who are competent and experienced in complex commercial and class action litigation, and Plaintiff and his counsel intend to prosecute this action vigorously on behalf of all Class members. The Class members' interests will therefore be fairly and adequately protected by Plaintiff and his counsel.

142. ***Injunctive and Declaratory Relief – Federal Rule of Civil Procedure 23(b)(2).*** Certification under Rule 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds that apply generally to the Class, making final injunctive and declaratory relief appropriate for the Class as a whole. Plaintiff seeks injunctive relief to stop Defendants from continuing the unlawful conduct alleged in this Complaint and to restore competitive conditions in the market for dairy products.

143. ***Superiority – Federal Rule of Civil Procedure 23(b)(3).*** A class action is superior to any other available method for fairly and efficiently adjudicating this controversy, and managing this class action is unlikely to present unusual difficulties. The damages and other financial harm suffered by Plaintiff and Class members are relatively small compared to the burden and expense of litigating their claims against Defendants individually, making it impracticable for Class members to seek redress individually for Defendants' wrongful conduct. Even if Class members could afford to litigate individually, the court system could not. Individualized litigation risks inconsistent or contradictory judgments and increases delay and expense for all parties and the court system. A class action, by contrast, presents far fewer management difficulties and offers the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

## COUNT I:

## CONSPIRACY IN RESTRAINT OF TRADE
**(Sherman Act § 1, 15 U.S.C. § 1; Clayton Act § 16, 15 U.S.C. § 26 — Injunctive Relief Only)**

144. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

145. Plaintiff asserts this Count only for equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, based on Defendants' contract, combination, and conspiracy

in restraint of trade, which violates Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff does not seek federal antitrust damages in this Count.

146. Defendants' agreement to coordinate exports and restrict the domestic supply of dairy products is an unreasonable restraint of trade under Section 1 of the Sherman Act. No legitimate, non-pretextual procompetitive business justification for the conspiracy outweighs its harmful effects, and any claimed justification could have been achieved through substantially less restrictive means.

147. Defendants and their co-conspirators furthered and carried out their contract, combination, and conspiracy through, among other things, the following acts:

a. Before the Class Period, dairy prices could not be sustained because of a fluctuating imbalance of supply over demand: after bursts of high prices, producers would add production capacity, and prices would fall again.

b. Against that backdrop, Defendants acted in concert with competitors, with and through CWT and other trade groups, and with non-member co-conspirators, and contracted, combined, and conspired to bring about a substantial reduction in the domestic supply of raw milk, cheese, butter, and other dairy products through the Export Assistance Program, causing supracompetitive price increases throughout the distribution chain and at retail.

c. Defendants conspired to substantially reduce the domestic dairy supply through frequent mass exports of cheese and other dairy products under the Export Assistance program. These actions were extraordinary, noncompetitive, and at odds with economic fundamentals.

d. Throughout the Class Period, Defendants took significant steps to sustain their overarching conspiracy to restrain output and production and thereby lift the over-order prices of raw milk, butter, and cheese to supracompetitive levels, and those steps produced supracompetitive prices for raw milk, cheese, and butter throughout the Class Period.

148. The conspiracy achieved its intended effect. Defendants benefited from the constrained supply of dairy products and the reduction in competition, which artificially inflated the prices of raw milk, butter, cheese, and other dairy products, as alleged in this Complaint.

149. Defendants' unlawful conduct has caused Plaintiff and the other Class members to suffer, and to continue to face the threat of, loss and damage in the form of artificially inflated prices for dairy products bought at retail. Plaintiff therefore seeks injunctive and other equitable relief to prevent and restrain Defendants from continuing their unlawful conduct and to remedy its ongoing effects.

**COUNT II:**

**VIOLATIONS OF STATE ANTITRUST LAWS**
**(Indirect Purchaser States)**

150. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

151. Defendants' contract, combination, and conspiracy in restraint of trade violated the antitrust laws of the states that allow indirect purchasers to recover, including Arizona (Ariz. Rev. Stat. § 44-1408); Arkansas (Ark. Code Ann. § 4-75-315); California (Cal. Bus. & Prof. Code §§ 16720, 16750); Colorado (Colo. Rev. Stat. § 6-4-115); Connecticut (Conn. Gen. Stat. § 35-46a); District of Columbia (D.C. Code § 28-4509); Florida (Fla. Stat. § 542.21 et seq.); Hawaii (Haw. Rev. Stat. § 480-14); Illinois (740 ILCS 10/7); Iowa (Iowa Code § 553.12); Kansas (Kan. Stat.

Ann. § 50-161); Maine (Me. Rev. Stat. Ann. tit. 10, § 1104); Maryland (Md. Code Ann., Com. Law § 11-209); Michigan (Mich. Comp. Laws § 445.778); Minnesota (Minn. Stat. § 325D.57); Mississippi (Miss. Code Ann. § 75-21-9); Nebraska (Neb. Rev. Stat. § 59-829); Nevada (Nev. Rev. Stat. § 598A.210); New Hampshire (N.H. Rev. Stat. Ann. § 356:11); New Mexico (N.M. Stat. Ann. § 57-1-3); New York (N.Y. Gen. Bus. Law § 340); North Carolina (N.C. Gen. Stat. § 75-16); North Dakota (N.D. Cent. Code § 51-08.1-08); Oregon (Or. Rev. Stat. § 646.780); Rhode Island (R.I. Gen. Laws § 6-36-11); South Dakota (S.D. Codified Laws § 37-1-33); Tennessee (Tenn. Code Ann. § 47-25-106); Utah (Utah Code Ann. § 76-10-3109); Vermont (Vt. Stat. Ann. tit. 9, § 2465); Virginia (Va. Code Ann. § 59.1-9.12); West Virginia (W. Va. Code § 47-18-9); and Wisconsin (Wis. Stat. § 133.18).

152. As a direct and proximate result of Defendants' violations of these state antitrust statutes, Plaintiff and Class members paid supracompetitive prices for dairy products, and the overcharges resulting from Defendants' conduct passed through the distribution chain to Plaintiff and Class members as indirect purchasers.

153. Plaintiff and Class members seek damages, including treble damages where authorized, along with attorneys' fees, costs, injunctive relief, and all other relief available under these state antitrust statutes.

**COUNT III:**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE CONSUMER PROTECTION LAWS**

154. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

155. Defendants' anticompetitive conduct is an unfair and/or deceptive trade practice that violates state consumer protection laws, including but not limited to Alaska (Alaska Stat. §

45.50.471 et seq.); Arizona (Ariz. Rev. Stat. § 44-1522 et seq.); Arkansas (Ark. Code Ann. § 4-88-101 et seq.); California (Cal. Bus. & Prof. Code § 17200); District of Columbia (D.C. Code § 28-3901 et seq.); Florida (Fla. Stat. § 501.204); Illinois (815 ILCS 505/2); Indiana (Ind. Code § 24-5-0.5-1 et seq.); Maine (Me. Rev. Stat. Ann. tit. 5, § 205-A et seq.); Maryland (Md. Code Ann., Com. Law § 13-101 et seq.); Massachusetts (Mass. Gen. Laws ch. 93A, § 1 et seq.); Michigan (Mich. Comp. Laws § 445.901 et seq.); Minnesota (Minn. Stat. § 325F.68 et seq.); Mississippi (Miss. Code Ann. § 75-24-1 et seq.); Missouri (Mo. Rev. Stat. § 407.010 et seq.); Nebraska (Neb. Rev. Stat. § 59-1601 et seq.); Nevada (Nev. Rev. Stat. § 598.0903 et seq.); New Hampshire (N.H. Rev. Stat. Ann. § 358-A:1 et seq.); New Mexico (N.M. Stat. Ann. § 57-12-1 et seq.); North Carolina (N.C. Gen. Stat. § 75-1.1 et seq.); Oregon (Or. Rev. Stat. § 646.605 et seq.); Pennsylvania (73 Pa. Stat. Ann. § 201-1 et seq.); Rhode Island (R.I. Gen. Laws § 6-13.1-1 et seq.); South Dakota (S.D. Codified Laws § 37-24-1 et seq.); Texas (Tex. Bus. & Com. Code § 17.41 et seq.); Utah (Utah Code Ann. § 13-11-1 et seq.); Vermont (Vt. Stat. Ann. tit. 9, § 2451 et seq.); Virginia (Va. Code Ann. § 59.1-196 et seq.); West Virginia (W. Va. Code § 46A-6-101 et seq.); and Wyoming (Wyo. Stat. Ann. § 40-12-101 et seq.).

156. Defendants' conduct was unfair and/or unconscionable because it artificially inflated the prices of essential consumer goods through collusive manipulation of supply.

157. As a direct and proximate result of Defendants' unfair and/or deceptive conduct, Plaintiff and Class members suffered an ascertainable loss by paying artificially inflated prices for dairy products bought at retail, and they are entitled to damages, restitution, disgorgement, injunctive relief, attorneys' fees, and all other relief available under applicable state law.

## COUNT IV:

## UNJUST ENRICHMENT UNDER STATE LAW

158. Plaintiff repeats and realleges each of the preceding paragraphs as if fully set forth herein.

159. Defendants were unjustly enriched at the expense of Plaintiff and Class members, who ultimately paid, through the distribution chain, the supracompetitive prices for dairy products that Defendants' anticompetitive conduct produced.

160. Allowing Defendants to keep the benefit of those overcharges would be inequitable, and Plaintiff and Class members therefore seek restitution, disgorgement, and any other equitable relief the Court deems just and proper.

## RELIEF REQUESTED

WHEREFORE, Plaintiff and Class members respectfully request the following relief:

A. Certification of this Action as a class action under Federal Rule of Civil Procedure 23, appointment of Plaintiff as Class Representative, and appointment of his counsel of record as Class Counsel;

B. A judgment and decree that the conduct alleged violates Section 1 of the Sherman Act, applicable state antitrust statutes, applicable state consumer protection statutes, and principles of unjust enrichment;

C. A judgment for the damages sustained by Plaintiff and the Class defined in this Complaint, and for any additional damages, penalties, restitution, disgorgement, and other monetary relief available under applicable law, including treble damages under applicable state statutes;

D. An order requiring Defendants to disgorge all ill-gotten gains and pay restitution to Plaintiff and the Class to the fullest extent permitted by law;

E. An award to Plaintiff and Class members of pre-judgment and post-judgment interest as provided by law, at the highest legal rate, from and after service of the initial Complaint in this Action;

F. The costs of this suit, including reasonable attorneys' fees, expert fees, and expenses, to the extent provided by law;

G. Declaratory, injunctive, and equitable relief appropriate to remedy and prevent the continuing effects of Defendants' violations of federal and state law; and

H. Any other and further relief the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, individually and on behalf of all others similarly situated, demands a trial by jury under Federal Rule of Civil Procedure 38 on all claims so triable.

DATED: October 26, 2026

Respectfully submitted,

*/s/ David Hilton Wise*
David Hilton Wise (VA Bar No. 30828)
Dylan Scout Graham (VA Bar No. 100051)
**WISE LAW FIRM, PLC**
10640 Page Avenue, Suite 320
Fairfax, VA 22030
Telephone: (703) 934-6377
Facsimile: (703) 934-6379
*dwise@wiselaw.pro*
*dgraham@wiselaw.pro*

Israel David*
Adam M. Harris*
**ISRAEL DAVID LLC**
60 Broad Street, Suite 2900
New York, New York 10004
Telephone: (212) 350-8850
Facsimile: (212) 350-8860

*israel.david@davidllc.com*
*adam.harris@davidllc.com*

Mark A. Cianci*
**ISRAEL DAVID LLC**
399 Boylston Street, Floor 6, Suite 23
Boston, MA 02116
Telephone: (617) 295-7771
Facsimile: (212) 350-8860
*mark.cianci@davidllc.com*

*Pro hac vice application forthcoming

***Attorneys for Plaintiff and the Proposed Class***